No. 14,651.

McNeil Coal Corporation et al. *v.* Industrial
Commission et al.

(96 P. [2d] 889)

Decided November 27, 1939.

Mr. Horace N. Hawkins, Mr. Horace N. Hawkins, Jr., for plaintiffs in error.

Mr. Byron G. Rogers, Attorney General, Mr. Frank A. Bruno, Assistant, for defendants in error.

*En Banc.*

Mr. Justice Otto Bock delivered the opinion of the court.

THIS is a workman's compensation case. The employer is a Colorado corporation engaged in the business of mining and selling coal. The employee commenced working for the company October 12, 1938, and the accident resulting in his instant death occurred at 8:30 a.m. on the same day. Claim for compensation was duly presented to the Industrial Commission by the dependents of deceased employee, and an award entered in their favor in the sum of $3984.38, May 8, 1939. Thereafter this action was instituted in the district court where judgment affirming the award of the commission was duly entered, to review which the employer brings the case here by writ of error.

The sole question presented for our consideration concerns the refusal of the trial court to direct the commission to reduce the amount of compensation fifty per cent under the provisions of section 362, chapter 97, '35 C. S. A., the portions of which, pertinent to the facts presented by the record, read:

"The compensation provided for herein shall be reduced fifty per cent: * * * (b) Where injury results from the employee's wilful failure to obey any reasonable rule adopted by the employer for the safety of the employee."

The commission found as follows: "The Commission finds from the evidence that decedent's action in climbing to the top of the abandoned shaft was for the purpose of doing the work at hand and was not the violation of 'any reasonable rule adopted by the employer for the safety of the employees'." Liability on the part of the employer was admitted.

The record discloses that upon the day in question the employer was having trouble with a crusher, and that a piece of sheet iron was needed in its repair. The company superintendent learning that a small iron door on an old abandoned air shaft "was suitable for the job," took the employee with him to assist in removing it. Upon arriving at the shaft the two men proceeded to

take down the door but encountered some difficulty, by reason of the fact that it was held securely by a two by six at the top. The employee suggested, "I can go up and push that 2 x 6 away and relieve the door and get the door off." Since the testimony of the superintendent is of vital importance, we deem it advisable to quote it somewhat in detail:

"Q. Were you working with Mr. Caumiant on the morning of October 12th, 1938? A. Yes, sir.

"Q. Will you please state to the Referee what happened at that time? A. Well, on the morning in question we had had a little trouble with our crusher two days before that, and I took August Caumiant down there to get a piece of sheet iron to fix up the crusher that morning.

"Q. Just tell what happened. A. Well, we looked all over the place and then I learned that the small door that was on the old abandoned air shaft was just the right size and I went over there to measure it up, and after measuring it we found it was suitable for the job, so we were going to take it off and put it on the crusher.

"Q. Will you proceed and tell what happened? A. Well, on this door, it was partly open, and there was a two by six on top of the door holding it in this position (illustrating). Mr. Caumiant said to me, 'I can go up there and push that 2x6 away and relieve the door and get the door off,' and I told him not to go up there.

"Q. Why did you tell him not to go up there? A. Because I considered the place wasn't safe for anybody to go on.

\* \* \*

"Q. When you told Mr. Caumiant not to go on the roof or on top of the covering of this abandoned air shaft, did you tell him it was dangerous? A. No. He said to me, 'Is it safe?' and I said, 'I don't know.'

"Q. Did you tell him not to go on top? A. I told him I wouldn't go up there, and not to go up there.

\* \* \*

"Q. You told the deceased not to go up on the roof of this structure? A. What I told him was, when he asked me the question about going up there, I told him I wouldn't go up there because I considered it wasn't safe.

"Q. But you didn't tell him not to go? A. I told him not to go after that. He said he could go and kick this off."

After this conversation the superintendent turned his back to the employee and had walked about thirty feet, when the accident occurred. A report made by the employer to the Industrial Commission on the same day contains question No. 10, as follows:

"10. Was accident caused by

Failure to use safety device............................................
Yes or No

Intoxication of employee.................................................
Yes or No

Failure to obey safety rule..............................................
Yes or No

"If you answer yes, attach statement of facts." The question was not answered.

Question No. 13 of the same report and its answer are as follows: "13. Describe fully how accident occurred and what employee was doing at the time. [A.] Trying to get steel door from building over air shaft. Got on roof and same caved in."

The superintendent is the only person who, according to the evidence, knows whether any safety rule was adopted relating to this air shaft. It would be a reasonable inference to be drawn from the testimony adduced that no specific instruction was given to the employee to stay off the roof. The testimony is uncertain, ambiguous and lacks definiteness. It indicates only that the superintendent cautioned the employee, in a conversation which naturally would occur under the circumstances. Although the adoption of a rule does not have to be in writing, a conversation between the superinten-

dent and an employee, such as we have here, cannot, under the circumstances, be reasonably construed as the adoption of the rule within the meaning of section 362 (b), supra. Prior to the date of the accident, the superintendent had made an examination of this air shaft, together with a mine safety inspector, and although they found its condition highly dangerous, no warning signs were posted about it. The employee's service was of such short duration that he had had no opportunity to acquaint himself with any dangers surrounding the shaft.

Plaintiffs in error rely upon our opinion in *Stockdale v. Industrial Com.*, 76 Colo. 494, 232 Pac. 669. In that case we defined the word "wilful," as used in this section, as meaning "with deliberate intent." There employee, and all of his fellow workmen, had been warned that the bridge upon which the accident occurred was unsafe, and they were "forbidden under pain of discharge to use it with teams." This, of course, was the adoption of a rule for the safety of the employee and was known by him for some time prior to the accident. It was a specific instruction forbidding crossing the bridge with teams. We have no such factual situation in the case before us.

Construing section 362 (b), supra, we said in *Clayton Coal Co. v. De Santis,* 95 Colo. 332, 334, 35 P. (2d) 492: "It is only where the employer has adopted a rule for the safety of the workmen, and that rule is a reasonable one, and a workman wilfully fails to obey it, that the compensation of the workman is reduced 50 per cent."

The finding that there was no violation by the employee of any safety rule adopted by the employer was warranted under the facts. It cannot be said that there is any evidence establishing the adoption of a safety rule, nor is there any evidence of a deliberate intent on the part of the employee—in view of the circumstances here—to disobey any safety rule. To sustain

the contention of plaintiffs in error it would be necessary to so narrowly interpret section 362 (b), supra, as to be inconsistent with a liberal interpretation, which we have held is to be applied in construing the Workmen's Compensation Act. *Danielson v. Industrial Com.*, 96 Colo. 522, 44 P. (2d) 1011.

The district court was correct in approving the finding and award of the commission. The judgment is affirmed.

MR. JUSTICE FRANCIS E. BOUCK dissents.

The following dissenting opinion was filed January 25, 1940.

MR. JUSTICE FRANCIS E. BOUCK dissenting.

### I. The Law.

Under '35 C. S. A., chapter 97, section 362 (b), quoted in the court's opinion, the award of the Industrial Commission herein should have been reduced by fifty per cent because the death of Caumiant, the workman, on October 12, 1938, resulted from his wilful failure to obey a "reasonable rule adopted by the employer for the safety of the employee." There is nothing in the record to indicate or raise even a suspicion that the commission disbelieved any part of the testimony given by Park, the superintendent, who was uncontradicted. Had there been such disbelief, it would doubtless have been stated in the findings and award. It is significant that both the verdict of the coroner's jury on October 12, 1938 (the date of death), and the report of the state inspector of coal mines on October 14, 1938, show that absolute credence was given to Park's testimony. If there were any doubt in the minds of the Justices on this point and the commission could not be directed to reduce its award to fifty per cent, the case should at least be remanded with directions to make a specific finding as to the testimony. The commission's findings

now strongly indicate that it was under the same misconception of the legal principle involved as the district court, counsel for the defendants in error, and this court, in the face of our own previous decisions hereinafter discussed.

In Colorado a specific order or instruction such as the one which Park testified he gave his subordinate, namely, not to climb upon the unsafe roof in question, unqualifiedly constitutes such a reasonable rule for the employee's safety, even though it has not been in writing, or posted, and is entirely oral. The underlying principle was settled by this court in the leading case of *Industrial Commission v. Funk,* 68 Colo. 467, 469, 470, 191 Pac. 125, 127, which was cited with approval in *Stockdale v. Industrial Com.,* 76 Colo. 494, 496 (6), 232 Pac. 669, 670, the later case cited and discussed in the court's present opinion. The argument here based by the court's opinion upon the Stockdale case falls when considered in the light of the actual facts in the leading case, where the situation was strikingly similar to the one in the case at bar.

The soundness of the principle is not questioned in any way but is expressly assumed as correct in the brief filed herein by the defendants in error. The adverse argument in the brief that, "if Caumiant lacked the necessary knowledge to appreciate the dangers that existed about the premises, he could not have possessed the requisite deliberate intent to disobey the rule, order or instruction alleged to have been given by his superior," is of course fallacious. The same is true of a similar implication in the statements of the brief that Caumiant "had no opportunity to acquaint himself with the hidden dangers that lurked about his place of employment," and that "the warnings that were given by Park * * * were not conveyed to him in such a manner as to impress him with the dangers."

Contrary to the implications of the aforesaid statements in the brief, the sole question before the com-

mission was, Did the employee actually disobey an oral instruction to stay off the particular roof? His fancied knowledge or impressions—or the lack of them—relative to the possible danger of disobeying the instruction or rule are irrelevant.

The district court, to be sure, erroneously took the view that a rule is not binding unless it has been put in writing and posted. The trial court's duty, however, was to follow—not to overrule by implication—the express holdings of this court in the Stockdale and Funk cases, supra, when read together.

## II. The Facts.

In the brief of the defendants in error it is said:

"The success or failure of the employer company's case depends upon the testimony given by the witness Daniel Park, their Superintendent in charge of the work Caumiant was employed to perform.

"For convenience, we set out all of the testimony given by Park dealing with the question as to whether or not the employer company had adopted a reasonable safety rule."

Then follow certain excerpts from the testimony, but by no means "all of the testimony" on the question.

In connection with the above mentioned excerpts, the brief argues:

"Park is the only person who knows whether or not a specific order or instruction was given to the employee to stay away from the roof because of its dangerous condition. He alone can shed light upon this situation, for the only other person who could have done so is dead, his lips are sealed. Careful consideration of the testimony given by Park shows its weakness and forces one to the conclusion that he never gave a specific instruction to Caumiant to stay off this roof. The Court will note that his testimony in this respect shows uncertainty, lack of definiteness, ambiguity, and is highly contradictory. * * *

"[Park's] answer again and again to the specific question, did you tell Caumiant not to go on top, was 'I told him I wouldn't go up there.' (folios 50, 51) This is not a specific instruction or order, but at best is the usual word of caution—to be careful—that normally passes between employer and employee." [!]

That this comment was hastily made and in its effect is unfair becomes manifest when we amplify the quoted testimony by supplying the testimony omitted both from the brief and from the court's opinion herein. I now supplement the quoted part by inserting that which was not quoted:

Direct examination:

"Q. Go ahead, if you will. A. I told him that in the meantime if he would clean away the concrete that was keeping the door from swinging wide open that I would go back to the tipple and get a hammer and chisel and we would be able to cut the bolts that were holding the door and in that way get it off.

"Q. Then what happened? A. I was on the way back to the tipple and I turned around and I saw Caumiant's head disappear."

\* \* \*

Cross-examination:

"Q. Mr. Park, how long have you been superintendent at the McGregor Mine? A. Since September, 1937.

"Q. Did you have occasion to inspect this structure over the air shaft? A. The last time that I was there I was along with the safety inspector.

"Q. Who was the safety inspector? A. Bill Murray.

"Q. You inspected that particular structure over the air shaft? A. Yes, sir.

"Q. Did you find that safe or unsafe? A. It was in a very poor condition."

\* \* \*

"Q. After you told him not to go up, what did you do? A. Well, I told him to clear away the concrete at the bottom of the door. There was some loose concrete

there I told him to clean away that and in the meantime I would go and get a hammer and chisel and we would in that way break the bolts that were holding the door.

"Q. What did you do next? A. Then I went to go and get the hammer and the chisel.

"Q. What then? A. When I was on my way I heard this noise and turned around and saw him disappear down the shaft.

"Q. How far were you from there when it collapsed? A. Maybe 30 feet, and maybe a little more.

"Q. How long did it take you to walk 30 feet? A. About 30 seconds.

"Q. 30 feet? A. A step a second.

"Q. And every step is a foot, according to your measurements? A. No, I made a mistake there. It would be a little less than that.

"Q. You mean a little less than a foot? A. In time.

"Q. How long would you think it took you to walk that 30 feet? How many seconds? A. Around 10 seconds.

"Q. And you heard a noise and turned around? A. Yes.

"Q. Was there a step ladder around that structure? A. No.

"Q. Was there any way for anybody to climb on top of that structure? A. Yes. The concrete was broken at the side of the door and there were two or three little holes there at the side of the door, but there was no ladder.

"Q. Do you think a man could climb up there by using these little holes? A. Yes.

"Q. How long would it take him to climb up there? A. Four or five seconds.

"Q. He could just climb up there in four or five seconds without any footholds or handholds? A. Yes.

"Q. You didn't hear any noise before you turned, did you? A. No.

"Q. Why did you turn? A. Because I heard the noise of the structure giving away."

The opinion mentions—as if it were an important evidential matter for this court to consider—that the employer failed to insert "yes" on a printed report blank as to whether the accident was caused by "failure to obey safety rule." No penalty is prescribed for such omission, nor does any statute require such an answer. Moreover, the letter of October 26, 1938, from the insurance carrier, specifically claiming the fifty per cent reduction because of such failure to obey, reached the commission either on the same day as the employer's report (forwarded through the carrier), or on the day following, two weeks after the death and more than a week before dependents' claim was filed. The commission file shows that at no time was there any doubt that the right to a fifty per cent reduction was consistently claimed.

### III. Conclusion.

It is respectfully submitted that the evidence, supplemented as it is by the above quotations from the record of the remaining evidence on the one important question, neither is "uncertain" or "ambiguous" nor "lacks definiteness." The situation is much like that existing in *Stockdale v. Industrial Commission, supra,* where the only available evidence as to the alleged safety instruction was the testimony of "the employer in charge of the work," Mr. Justice Denison's opinion declaring at page 496 (Pacific page 670): "It is claimed that Hotchkiss gave Hunter leave to cross the bridge at the time in question, but Hotchkiss testified, and we must take it as true, that he directed Hunter to cross the bridge with the tank empty, and to fill it afterwards."

With the Funk and Stockdale cases, supra, in full force as the ruling authorities in Colorado, unweakened by any adverse criticism, it follows that the commission was wrong in its decision and should have deducted

one-half of the compensation. The district court erred in approving the commission's award of the full amount. The case should be remanded to the district court with directions to return the record to the commission with instructions to reduce the award accordingly, or, at the very least, with alternative directions to have the commission make specific findings in regard to the giving of an instruction or rule within the letter and spirit of the two Colorado decisions heretofore cited.

For the reasons above appearing, I dissent.